IN THE SUPREME COURT OF NORTH CAROLINA

No. 307PA23

Filed 17 October 2025

STATE OF NORTH CAROLINA

v.

MARIO WILSON

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review a divided decision of the Court of Appeals, 291 N.C. App. 279 (2023), finding no error in part and reversing in part judgments entered on 5 March 2020 by Judge Todd Pomeroy in Superior Court, Cleveland County, and remanding the case. Heard in the Supreme Court on 11 February 2025.

*Jeff Jackson, Attorney General, by Zachary K. Dunn, Special Deputy Attorney General, for the State-appellant.*

*Marilyn G. Ozer for defendant-appellee.*

BERGER, Justice.

This case, like many recent *Batson* cases before this Court, represents another attempt to undermine the deserved deference afforded to trial court judges. This deference is afforded because trial court judges, unlike appellate judges, "observe firsthand the reactions, hesitations, emotions, candor, and honesty of the lawyers and veniremen during voir dire questioning," *State v. Smith*, 328 N.C. 99, 127 (1991), and therefore are "in by far the best position to make the *Batson* prima facie case determination," *United States v. Moore*, 895 F.2d 484, 486 (8th Cir. 1990).

-1-

Because it will be the exceedingly rare case indeed where a trial court's step-one determination is ruled clearly erroneous, those who desire to second-guess a trial court's step-one determination have increasingly relied on the mootness exception to circumvent this deference. The Court of Appeals' majority acquiesced to this tactic below. We reverse the Court of Appeals' judgment, remand, and reiterate that the mootness doctrine to *Batson*'s three-step process is an exception to be applied cautiously, not a rule to be foisted upon every case in which the transcript does not reveal a surgically precise exchange between the parties and the trial court.

## I.    Factual and Procedural Background

Defendant was indicted on two counts of first-degree murder, one count of attempted first-degree murder, one count of robbery with a dangerous weapon, and one count of conspiracy to commit robbery with a dangerous weapon stemming from his involvement in an armed robbery during which he shot and killed Miranda Woods and three-year-old Liam Murray. Defendant also shot Jerrod Shippy, leaving him permanently paralyzed from the waist down. Defendant's matter came on for trial in February 2020.[1]

During jury selection, the State exercised peremptory challenges to excuse two black female prospective jurors, Sandra Moore (Juror No. 9) and Veronica Stroud (Juror No. 10). Juror No.4, Eva Sims, was a black juror who was excused for cause

---

[1] At the close of the State's evidence at trial, the State amended the robbery charge to attempted robbery.

when she acknowledged that she knew members of defendant's family and support group in the courtroom, had a nephew that had been imprisoned for a robbery conviction in Cleveland County, and that she would not be able to look at the crime scene photos or listen to testimony concerning the autopsy and set aside her personal feelings about the case.

Juror No. 9 responded in the affirmative when asked if she knew anyone in the courtroom associated with defendant. In addition, she informed the State that her uncle had been convicted of a sex offense in Cleveland County and that he was still listed on the Sex Offender Registry. The State ultimately exercised a peremptory strike to excuse Juror No. 9.

The State also used a peremptory challenge to excuse prospective Juror No. 10. Juror No. 10 stated that she did not know anyone in the courtroom associated with defendant and that she would not be bothered by the graphic photos. When the State asked if any of the prospective jurors had previously been to the courthouse for any reason, Juror No. 10 replied that she had been charged with an open container offense, but paid the fine for that charge rather than attend court because she did not "have time for that" because she had a baby.

After the State excused Juror No. 10, defendant objected to the State's use of peremptory challenges:

> [DEFENSE COUNSEL]: Your Honor, this is a *Batson*. So far, what I've seen is the State, I believe, has used two peremptory challenges and both were African-Americans that she struck, especially the first juror, [Juror No. 9].

THE COURT: Right, who knew one of the relatives of the defendant. They went to high school.

[DEFENSE COUNSEL]: Yes, they did, but the State passed on others who knew some members. And Juror No. 4, although it was for cause, she was also an African-American female. Now, she has struck [Juror No. 10] who is an African-American female. [Juror No. 10], other than—she did not know any of the family members. And all I heard was that she had issues with child care, which [Juror No. 11] also had issues with child care, and she passed on her.

THE COURT: Okay. Does the State want to be heard?

[THE STATE]: Your Honor, I am not sure that the Court can consider Juror No. 4 because it was for cause and there was no objection. I really liked [Juror No. 9], but, of course, I'm concerned that she points out someone who's sitting on the front row. She points out Mr. Gaskin as someone that she knows. I'm not going to keep anybody that knows—unless I absolutely have to—that knows a member of the defendant's family. There's too strong of a feeling there.

In my past experience, even if it is tangential—we went to high school; tie to the family—I do not keep that. In all honesty, I probably would have stricken Juror No. 4 because her daughter dated Mr. Gaskin's son and she knew two of [defendant's] relatives. Just to be honest with the Court, that would have been the reason there.

The reason that I attempted to strike [Juror No. 10] is when she came up and sat down, she immediately began to yawn. She's yawned several times throughout the brief period of time I talked to her. That concerns me. I have had jurors fall asleep and not listen to the evidence before.

And when I asked her about paying the fine, she said "I have the baby and I don't have time to come up here and mess with anything like an open container." So I do have real concerns about her commitment to paying attention, to being awake and alert, and to how serious this proceeding is. Those are my reasons for striking her.

THE COURT: Yes, sir, anything else?

[DEFENSE COUNSEL]: I understand knowing someone in the family. However, knowing the family of—Mr. Gaskin, his family is well known in the community. And you will strike a lot of African-Americans just because the family is African-American, which although it may not be systematic in its nature although it does sound race neutral.[2] But . . . another thing I would like to point out is there are several people on the jury that ha[ve] said they know [the prosecutor] and she passed on them.

THE COURT: All right. I don't believe there's been a prima facie case for a *Batson* challenge. The Court is going to deny that challenge[.] [A]nything else we need to address[?]

[THE STATE]: Not from the State.

THE COURT: For the record, the juror in question is a black female. Juror No. 6 was on the jury and he is a black African-American male. The State has not targeted race as a component of its questioning. The Court did note the demeanor of Juror No. 10 during questioning and certainly was concerned about her. We will be in recess for ten minutes.

At the conclusion of trial, the jury convicted defendant of all charges. The trial court sentenced defendant to consecutive life sentences without parole for the two first-degree murder convictions and a consolidated judgment of 207 to 261 months imprisonment for the remaining convictions, to run consecutively with the first-degree murder sentences.

---

[2] One could argue that defense counsel here acknowledges that his subjective intent in making the *Batson* objection was not genuine concern about racial discrimination but rather an attempt to use race as a proxy to challenge otherwise legitimate strikes. Such actions not only weaponize *Batson* objections but trivialize real discrimination. Trial courts should be cautious of arguments that use demographic coincidence dressed up as discriminatory exclusion.

Defendant timely appealed, and a divided panel of the Court of Appeals remanded for a new *Batson* hearing "in light of the trial court's procession to *Batson*'s third step and subsequent failure to conduct an analysis satisfactory under the procedural requirements established in *State v. Hobbs*."  *State v. Wilson*, 291 N.C. App. 279, 296 (2023) (citing *State v. Hobbs*, 374 N.C. 345 (2020)).  The dissenting opinion reasoned that because it was the State—not the trial court—that moved past step one of *Batson* prior to the trial court's ruling at step one, and because "[e]xisting case law does not impute the actions of the parties . . . to the trial court," step one was not moot and remand was unnecessary.  *Id.* at 299 (Stading, J., concurring in part and dissenting in part).

The State failed to timely appeal based on the dissent and therefore petitioned this Court for a writ of certiorari.  This Court allowed the State's petition for writ of certiorari to review whether the Court of Appeals erred in holding that step one of *Batson* was moot and remanding the case for a hearing under *Hobbs*, 374 N.C. 345 (2020).  We reverse and remand.

## II.   Standard of Review

"The job of enforcing *Batson* rests first and foremost with trial judges."  *State v. Campbell*, 384 N.C. 126, 131 (2023) (cleaned up) (quoting *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019)).  "Trial judges, who are 'experienced in supervising voir dire,' and who observe the prosecutor's questions, statements, and demeanor firsthand, are well qualified to 'decide if the circumstances concerning the

prosecutor's use of peremptory challenges create[ ] a prima facie case of discrimination against black jurors.' " *State v. Chapman*, 359 N.C. 328, 339 (2005) (alteration in original) (quoting *Batson v. Kentucky*, 476 U.S. 79, 97 (1986)).

"Thus, when a trial court rules that a defendant has failed to demonstrate a prima facie case of discrimination, 'the trial court's ruling is accorded deference on review and will not be disturbed unless it is clearly erroneous.' " *Campbell*, 384 N.C. at 131–32 (cleaned up) (quoting *State v. Augustine*, 359 N.C. 709, 715 (2005)). "As with any other case, issues of law," such as whether step one of *Batson* is moot, "are reviewed de novo." *Hobbs*, 374 N.C. at 349.

### III.   Discussion

**A. *Batson*, Mootness, and the Court of Appeals' Decision**

*1.  Jury Selection*

In all criminal cases tried before a jury, prospective jurors may be removed from the jury in two different ways. First, an attorney may ask the court to remove a prospective juror for cause under section 15A-1212 of our General Statutes, which provides nine separate grounds supporting such a challenge, including that the prospective juror "[a]s a matter of conscience . . . would be unable to render a verdict . . . in accordance with the law of North Carolina" or "[f]or any other cause is unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(8)–(9) (2023).

Second, in noncapital criminal cases, both the State and the defendant are allowed six peremptory challenges and "one peremptory challenge for each alternate

juror in addition to any unused challenges." N.C.G.S. § 15A-1217(b)–(c) (2023). Peremptory strikes, which "have very old credentials and can be traced back to the common law," are entirely discretionary and "traditionally may be used to remove any potential juror for any reason—no questions asked." *Flowers*, 588 U.S. at 293.

### 2. *Batson*

At issue in *Batson* challenges is the use of discretionary peremptory challenges. This discretion is not limited, and an "attorney's 'privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause' " of the United States Constitution, "which forbids the striking of prospective jurors if 'race was significant in determining who was challenged and who was not.' " *Campbell*, 384 N.C. at 133 (cleaned up) (first quoting *Batson*, 476 U.S. at 89, then quoting *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005)). In *Batson*, the Supreme Court of the United States crafted a three-part test to determine whether a peremptory strike was "motivated in substantial part by discriminatory intent," *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008), and this Court has "adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution," *State v. Fair*, 354 N.C. 131, 140 (2001).

When an attorney raises a *Batson* challenge, in the absence of direct evidence of racist motives, the trial court essentially attempts to evaluate subjective intent from external circumstances by engaging "in a three-step inquiry to evaluate the merits of the objection." *Campbell*, 384 N.C. at 133.

At *Batson*'s first step, "the trial court must determine whether the defendant has met his or her burden of establishing a prima facie case that the peremptory challenge was exercised on the basis of race." *Id.* (cleaned up). This is a "fact-intensive" inquiry, and "the trial court should consider all relevant circumstances." *Higgins v. Cain*, 720 F.3d 255, 266 (5th Cir. 2013) (quoting *Batson*, 476 U.S. at 96). "A defendant meets his or her burden at step one 'by showing that the totality of the relevant facts give rise to [an] inference of discriminatory purpose.' " *Campbell*, 384 N.C. at 134 (quoting *Batson*, 476 U.S. at 94).

"In response to this initial challenge, the prosecutor may argue that the defendant has failed to establish a prima facie showing of discrimination." *Id.* (cleaned up). As the Supreme Court of the United States and this Court have noted, an attorney's "statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.* (quoting *Batson*, 476 U.S. at 97). And "[j]ust as judges may consider questions and statements of prosecutors when determining whether a prima facie case has been established . . . , judges may also consider plainly observable prospective juror conduct . . . which would justify the use of a peremptory strike." *State v. Tucker*, 385 N.C. 471, 489 (2023), *cert. denied*, 145 S. Ct. 196 (2024). "The law does not require that trial judges disregard evidence of such conduct," or any of the other relevant circumstances, "in considering whether a prima facie case of discrimination has been established." *Id.* In other words, a trial judge is not required to ignore readily

apparent conduct in making a step one determination.

"Only when the trial court determines that a defendant successfully established prima facie showing will the *Batson* inquiry proceed[ ] to the second step." *Id.* at 488. Here, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (plurality opinion). Because "*Batson*'s requirement of a race-neutral explanation means an explanation other than race," *id.* at 374 (O'Connor, J., concurring), "even if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three," *Johnson v. California*, 545 U.S. 162, 171 (2005).

At step three, "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination," *Hernandez*, 500 U.S. at 359, by examining "whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination," *Flowers*, 588 U.S. at 298. Unlike step one, which requires the trial court to determine whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose," *Batson*, 476 U.S. at 94, step three requires the trial court to resolve the ultimate inquiry of whether the peremptory challenge "was motivated in substantial part by discriminatory intent," *Flowers*, 588 U.S. at 303 (cleaned up). In doing so, the trial court must consider and weigh "the evidence in its totality." *Hobbs*, 374 N.C. at 360. "As in any equal protection case, the burden is, of course, on the defendant who alleges discriminatory

selection of the venire to prove the existence of purposeful discrimination." *Batson*, 476 U.S. at 93 (cleaned up). But "the burden of proof 'rests with, and never shifts from, the opponent of the strike.' " *State v. Clegg*, 380 N.C. 127, 175 (2022) (Berger, J., dissenting) (quoting *Johnson*, 545 U.S. at 171).

### 3. Mootness

Because the *Batson* inquiry properly concludes at step one if the trial court determines the defendant failed to establish a prima facie case, *Tucker*, 385 N.C. at 487, appellate courts reviewing such cases generally consider only whether the trial court clearly erred in making that determination. *See Campbell*, 384 N.C. at 131–32.

However, the Supreme Court of the United States has held that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges *and the trial court has ruled on the ultimate question of intentional discrimination*, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359 (emphasis added). This Court has similarly held that "[w]here the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, *and the trial court has ruled on them, completing* Batson*'s third step*, the question of whether a defendant initially established a prima facie case of discrimination becomes moot." *Hobbs*, 374 N.C. at 354 (emphasis added).

"[W]e have expressly stated that it is error for a trial court to require a step two explanation in the absence of a prima facie showing by defendant." *Tucker*, 385 N.C. at 488 (citing *Campbell*, 384 N.C. at 136). This, combined with *Hobbs*, renders

mootness the exception, not the rule. Step one is only mooted when: (1) the State proffers race-neutral reasons, *Hobbs*, 374 N.C. at 354, and (2) the trial court considers those reasons and then rules on the ultimate question of intentional discrimination, *Hernandez*, 500 U.S. at 359. In other words, step one will be mooted only when all relevant actors—the trial court and both parties—proceed to fully complete the three-step *Batson* process *as if* the trial court had ruled in the defendant's favor at step one.

### 4. *Court of Appeals' Decision*

Here, defendant raised a *Batson* objection, arguing the State "used two peremptory challenges and both were African-Americans that she struck, especially the first juror, [Juror No. 9]." The trial court responded to the objection immediately by stating, concerning Juror No. 9, "Right, who knew one of the relatives of the defendant. They went to high school." Defendant then replied that the State had also excused Juror No. 4, who was also a black female, for cause, and that Juror No. 10 "did not know any of the family members . . . [and] had issues with the child care, which [another prospective juror] also had issues with child care, and [the State] passed on her."

At this point, the trial court asked, "Does the State want to be heard?" In responding to defendant's arguments, the State explained its concerns with prospective Juror No. 9 and prospective Juror No. 10. The trial court permitted defendant to respond to the State's reasoning, and after hearing from defendant, the trial court stated, "I don't believe there's been a prima facie case for a *Batson*

challenge." The trial court then noted, "For the record, the juror in question is a black female. Juror No. 6 was left on the jury and he is a black African-American male. The State has not targeted race as a component of its questioning. The Court did note the demeanor of Juror No. 10 during questioning and certainly was concerned about her."

The Court of Appeals' lead opinion determined that step one of *Batson* was mooted under these circumstances because "the trial court immediately sought the State's input upon hearing [d]efendant's argument under *Batson*'s first step" and because "the fact that [the trial court] issued the [step one] ruling after hearing the State's race-neutral reasons made the ruling, in substance, a ruling on the third step of *Batson*." *Wilson*, 291 N.C. App. at 293. In reaching this determination, the lead opinion stated that this Court's "reservation of its analysis to the first step of *Batson*" in *Campbell* was "based on the fact that 'the trial court clearly ruled there had been no prima facie showing *before* the State articulated its reasons.'" *Id.* at 291 (quoting *Campbell*, 384 N.C. at 136). The lead opinion reasoned that because step one was moot, the trial court was "required, pursuant to *Hobbs*, to engage in a full analysis of [d]efendant's arguments that the State employed its peremptory strikes in a racially discriminatory manner." *Id.* at 294. As the trial court had not done so, the lead opinion reversed in part and remanded the case "for a new *Batson* hearing . . . satisfactory under the procedural requirements established in *State v. Hobbs*." *Id.* at 296.

A separate concurrence acknowledged that "[c]ertainly, the State may be heard

during step one." *Id.* at 297 (Dillon, J., concurring). However, because the concurrence reasoned that "it appears the trial court did consider at least some of the State's step-two evidence," as "the trial court mentioned how one juror was inattentive as a race-neutral reason," he concluded the trial court had moved beyond step one. *Id.* Notably, the concurring judge stated that he would have held the trial court did not err in determining defendant failed to establish a prima facie case if step one had not been moot. *Id.*

Finally, Judge Stading dissented "from the majority's holding that the trial court failed to meet necessary procedural requirements imposed by *State v. Hobbs*." *Id.* at 297 (Stading, J., concurring in part and dissenting in part). Judge Stading correctly noted that this Court in *Campbell* "did not speak to whether the State's response to step two would have precluded the trial court judge from issuing a ruling on step one of the *Batson* analysis" and that in this case, "it was not the trial court, but the State, that proceeded to step two of the *Batson* inquiry." *Id.* at 298–99. Because our precedent permits the trial court to "invite the State to comment before issuing a ruling" on step one, and because Judge Stading determined "a review of the record shows that the trial court already made this determination on step one of the analysis prior to offering any commentary on juror demeanor," he disagreed with the majority's holding that step one was mooted. *Id.* at 299–300. Both Judge Stading and the concurring judge determined that the trial court did not err in concluding defendant failed to establish a prima facie case at step one. *Id.* at 297, 300.

## B. Analysis

As noted above, the lead opinion at the Court of Appeals appears to have concluded step one was moot for three reasons: (1) the circumstances were not identical to those in *Campbell*; (2) the trial court asked the State if it would like to respond to defendant's accusation of racial discrimination prior to the court's issuance of the step-one ruling; and (3) the trial court issued its step-one ruling after hearing the State's race-neutral reasons. The dissent below correctly recognized that none of these circumstances, either in isolation or taken together, compel a determination of mootness.

First, because mootness is an *exception* to normal appellate review of a trial court's *Batson* determination, cases like *Campbell* or *Tucker* do not establish exclusive circumstances under which a conclusion of mootness is inappropriate. As "our precedent is clear that a prima facie showing by defendant is an important step in a *Batson* analysis," *Tucker*, 385 N.C. at 488, and "it is error for a trial court to require a step two explanation in the absence of a prima facie showing by defendant," *id.*, the default rule is that step one is not moot, and cases holding thusly simply reflect that the defendant has failed to demonstrate circumstances sufficient to apply the mootness exception. To hold otherwise, thereby transforming the exception into the default rule, would effectively eliminate the defendant's required step one

showing.[3]

This is the nature of the Court of Appeals' first error below. As previously noted, step one will only be mooted if (1) the State proffers race-neutral reasons, *Hobbs*, 374 N.C. at 354, and (2) the trial court considers those reasons and rules on the ultimate question of intentional discrimination, *Hernandez*, 500 U.S. at 359. In *Campbell*, the trial court did not hold a full *Batson* hearing or rule on the ultimate question of intentional discrimination, and this Court held the mootness exception did not apply because "the trial court clearly ruled there had been no prima facie showing before the State articulated its reasons," 384 N.C. at 136 (cleaned up), i.e., because factor (2) had not been met. The Court of Appeals below erred by interpreting

---

[3] Unsurprisingly, this is the exact outcome our dissenting colleague recommended in a 2020 report from the now defunct N.C. Task Force for Racial Equity in Criminal Justice, which she co-chaired with then Attorney General Joshua Stein. The report recommended this Court enact an administrative rule change to radically overhaul our *Batson* jurisprudence by "focusing on outcomes over intent, . . . *abolishing the prima facie case*, disallowing strikes where race *could* be a factor, . . . and disallowing demeanor-based strikes." N.C. Task Force for Racial Equity in Criminal Justice, Report 2020, at 102 (2020) (emphasis added), *available at* https://ncdoj.gov/wp-content/uploads/2021/02/TRECReportFinal_02262021.pdf.

The attempt to eliminate step one is divorced from law and rooted entirely in socio-political policy preferences. Unlike the dissent's position and the Task Force's recommendation, our repeated adherence to the principle that step-one mootness is the exception rather than the rule reflects the fundamental maxim "incorporated in our Constitution: that we are all equal, and should be treated equally before the law without regard to our race," *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 277 (2023) (Thomas, J., concurring). That means every citizen, regardless of race, can be peremptorily challenged equally based on concerning and readily apparent conduct during jury selection. The dissent's "race-infused world view falls flat," *id.* at 280, because it boils down the *Batson* process to a single step: was the challenged juror part of a cognizable racial group? Such a "myopic world view based on individuals' skin color to the total exclusion of their personal choices" and conduct during jury selection, "is nothing short of racial determinism," *id.*, and we reject it wholly.

this holding as establishing exclusive circumstances under which the general rule applies rather than recognizing it for what it was—a holding that the defendant had failed to establish circumstances warranting the application of the exception. As with any exception to a general rule, the proper analysis begins with a presumption that the rule applies and ends with a determination that the proponent of the exception either has, or has not, demonstrated circumstances sufficient to depart from the general rule.

The Court of Appeals' second error stems from its erroneous reading of *Campbell* and the record here. According to the lead opinion, step one was mooted in part because "[u]nlike in *Campbell*, the trial court in this case immediately sought the State's input upon hearing [d]efendant's argument under *Batson*'s first step, issuing no preliminary ruling on whether [d]efendant had made a prima facie case." *Wilson*, 291 N.C. App. at 293. As discussed above, *Campbell* and *Hobbs* render these circumstances irrelevant when considering whether step one is mooted, as the trial court never made a step three determination.

We once again emphasize that, consistent with the plain language of *Batson* and our precedent, it is entirely appropriate for a trial court to solicit the State's response at step one, and "the prosecutor may argue that the defendant has failed to establish a prima facie showing of discrimination."[4]  *Campbell*, 384 N.C. at 134

---

[4] The dissent's convenient failure to acknowledge the State's ability to respond at step one comports with its unstated but obvious goal of "abolishing the prima facie case," N.C.

(cleaned up). The trial court has no control over *how* the State responds, and it would be inappropriate to limit the State's argument to something other than "all relevant circumstances." *See Higgins*, 720 F.3d at 266.

Moreover, an appellate court's arbitrary exclusion of legitimate arguments available to counter a defendant's contention that a prima facie case has been established eviscerates the deference afforded to a trial court's step-one determination and could preclude immediately apparent nondiscriminatory justifications for the strike. That goes too far.

"Just as judges may consider questions and statements of prosecutors when determining whether a prima facie case has been established . . . , judges may also consider plainly observable prospective juror conduct . . . which would justify the use of a peremptory strike." *Tucker*, 385 N.C. at 489. "The law does not require that trial judges disregard evidence of such conduct," or any of the other relevant circumstances, "in considering whether a prima facie case of discrimination has been established." *Id.* Nor does the law presume trial courts are blind to immediately apparent juror conduct justifying a strike whenever the State describes such conduct in arguing the defendant failed to establish a prima facie case. If the State strikes a juror who, for example, appeared bored, yawned repeatedly, or slept through the jury selection process, step one is not mooted merely because the State tells the trial court

Task Force for Racial Equity in Criminal Justice, Report 2020, at 102 (2020), *available at* https://ncdoj.gov/wp-content/uploads/2021/02/TRECReportFinal_02262021.pdf.

something it already knew.

In addition, as Judge Stading noted below, we do not impute the State's conduct during a *Batson* inquiry to the trial court. *Wilson*, 291 N.C. App. at 299 (Stading, J., concurring in part and dissenting in part). While the State's proffer of race-neutral reasons is *a* circumstance relevant to the mootness determination if the trial court makes a step-three determination, *see Hobbs*, 374 N.C. at 354, it is not *the* circumstance at step one, *see Tucker*, 385 N.C. at 489.

Finally, the Court of Appeals erred in determining step one was moot because the trial court "issued the ruling after hearing the State's race-neutral reasons" and this, under *Hobbs*, somehow transformed the ruling into "a ruling on the third step of *Batson*." *See Wilson*, 291 N.C. App. at 293. Though the lead opinion quotes *Hobbs* for the proposition that "where the State has provided reasons for its peremptory challenges . . . *and the trial court has ruled on them* . . . the question of whether a defendant initially established a prima facie case of discrimination becomes moot," *id.* at 294 (cleaned up) (emphasis added) (quoting *Hobbs*, 374 N.C. at 354), it conveniently failed to analyze whether the trial court ruled on the State's justifications. Instead, the lead opinion merely concludes that since the trial court "issued its ruling after soliciting input from the State, it was required . . . to engage in a full analysis" under *Batson*'s third step. *Id.* This was error.

The concurrence, in contrast, recognized that "the State may be heard during step one" and that "even if the State on its own mentions 'step-two' evidence, . . . the

trial court could ignore this step-two evidence and make a ruling on whether a *prima facie* showing had been made." *Id.* at 297 (Dillon, J., concurring). However, the concurrence nevertheless erroneously determined step one was moot because the trial court's mention of "how one juror was inattentive as a race-neutral reason" demonstrated "that the trial court moved beyond step one." *Id.*

The transcript belies this assertion. After hearing from the parties, the trial court stated, "I don't believe there's been a prima facie case for a *Batson* challenge. The Court is going to deny that challenge . . . ." The trial court asked if there was "anything else [it needed] to address," and the State replied, "Not from the State." Then, the trial court stated:

> For the record, the juror in question is a black female. Juror No. 6 was left on the jury and he is a black African-American male. The State has not targeted race as a component of its questioning. The Court did note the demeanor or Juror No. 10 during questioning and certainly was concerned about her.

We have previously stated that step one is not mooted when the trial court, after ruling the defendant failed to establish a prima facie case, orders the State to proffer race-neutral reasons "to facilitate appellate review," *Campbell*, 384 N.C. at 136, and the trial court's final statement "[f]or the record" here is no different. The trial court clearly ruled on step one prior to making these statements, at which point the *Batson* inquiry concluded.

Additionally, we note that the only statement here that could conceivably be based on the State's justifications is that "[t]he Court did note the demeanor of Juror

No. 10 during questioning and certainly was concerned about her." As this Court has consistently recognized, "[a]n appellate court is not required to, and should not, assume error by the trial judge when none appears on the record before the appellate court." *Id.* at 138 (quoting *State v. Alston*, 307 N.C. 321, 341 (1983)). "[J]udges may . . . consider plainly observable prospective juror conduct . . . which would justify the use of a peremptory strike." *Tucker*, 385 N.C. at 489. "The law does not require that trial judges disregard evidence of such conduct in considering whether a prima facie case of discrimination has been established." *Id.* Inattentiveness of a prospective juror is obviously a circumstance that could prevent a defendant from carrying his burden at step one, and the significance of this immediately apparent conduct does not dissipate simply because the State points it out.

It would plainly contradict these principles if we were to assume that the trial court's statement about Juror No. 10's demeanor was predicated solely upon the State's arguments to the trial court rather than the trial court's own observation of the prospective juror's immediately apparent demeanor and conduct. Just as trial court judges are not required to feign blindness or deafness at step one, appellate courts are not required to engage in a fiction or speculate that the State's input provides the singular source of information regarding permissible motivations for a peremptory challenge.

Nor are we compelled to impose upon trial court judges and trial attorneys a requirement of surgical precision during a *Batson* inquiry. That does not mean

anything goes—step one could certainly be mooted when a trial court erroneously proceeds with a full *Batson* hearing as if the trial court ruled in defendant's favor at step one. But unless that occurs, it is not the role of an appellate court to circumvent the deference due a trial court at step one based upon mere technical shortcomings from the prosecutor which are out of the trial court's control. To hold otherwise would wrongly encourage "an evidentiary hearing or 'mini-trial' on the merits of every *Batson* claim," *United States v. Iron Moccasin*, 878 F.2d 226, 229 (8th Cir. 1989), rather than "prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process," *Johnson*, 545 U.S. at 172–73 (cleaned up); *see also United States v. Tindle*, 860 F.2d 125, 130–31 (4th Cir. 1988) ("*Batson* does not require a trial within a trial[.]"). Thus, when the record contains a trial court's unambiguous ruling that a defendant failed to establish a prima facie case, it is wholly inappropriate to remand the case for a *Hobbs*-compliant step-three hearing.

Here, notwithstanding the State's description of readily apparent juror conduct the trial court had already observed firsthand, the trial court clearly ruled defendant failed to establish a prima facie case. The transcript does not indicate that the trial court moved the hearing to step two, nor does it reflect any ruling on whether the State's justifications were pretextual at step three. Because the trial court never proceeded to step two, it necessarily never reached step three. Under these circumstances, step one was not mooted. *See Hobbs*, 374 N.C. at 354.

As our scope of review in this matter is limited to the issue on which there was division at the Court of Appeals, *see C.C. Walker Grading & Hauling, Inc. v. S.R.F. Mgmt. Corp.*, 311 N.C. 170, 175 (1984), i.e., mootness, and as the lead opinion below did not address whether the trial court clearly erred in determining defendant failed to establish a prima facie case, we reverse the decision of the Court of Appeals and remand this matter to that Court for consideration of that issue.[5]

## IV. Conclusion

"[T]rial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Campbell*, 384 N.C. at 131 (alteration in original) (quoting *Batson*, 476 U.S. at 97); *see also Moore*, 895 F.2d at 486 ("The trial judge, with his experience in voir dire, is in *by far* the best position to make the *Batson* prima facie case determination." (emphasis added)). This practical reality compels appellate courts to afford great deference to a trial court's step-one determination, such that it "will not be disturbed unless it is clearly erroneous." *Augustine*, 359 N.C. at 715.

The step-one mootness doctrine was developed to address another practical reality; namely, that when a full *Batson* hearing occurs and the trial court has

---

[5] We recognize that both the concurring and dissenting opinions below would have held the trial court did not clearly err at step one. However, because the lead opinion did not address this issue and the concurring opinion addressed it only as an alternative ruling, we remand out of an abundance of caution.

erroneously proceeded to step three without objection as if the defendant cleared the step-one hurdle, the import of whether the defendant actually met his step-one burden evaporates. By improperly expanding this doctrine, litigants and jurists, as shown by the lead opinion below, could evade the deference owed to a trial court's step-one determination and effectively eliminate this step from the *Batson* inquiry. This is improper, and we reverse the Court of Appeals' judgment and remand the case to that court because this issue has been settled by a series of decisions, which includes *Batson* itself.

REVERSED AND REMANDED.

Justice EARLS dissenting.

Surely as important as "deserved deference afforded to trial court judges" are the twin constitutional underpinnings of the United States Supreme Court's jurisprudence following *Batson v. Kentucky*, 476 U.S. 79 (1986), namely the defendant's right to a jury of his peers whose members are selected on a nondiscriminatory basis and the right of prospective jurors to be chosen for the content of their character, not the color of their skin or their gender. *Id.* at 86 ("The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." (citations omitted)). As Justice Kavanaugh recently explained, "[o]ther than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 588 U.S. 284, 293 (2019). Therefore, "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Id.* at 301. Indeed, "[i]n the decades since *Batson*, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding." *Id.*

I dissent because the majority, in the name of deference, retreats from this Court's already improperly cramped understanding of federal precedent to add formalistic requirements about what talismanic words a trial court must utter when

a *Batson* objection is raised during trial. The rewriting of our precedent has the effect of preventing meaningful review of racial discrimination in jury selection and defeats the vitally important twin purposes of the *Batson* framework. I would affirm the Court of Appeals' judgment and remand for a proper *Batson* hearing consistent with *State v. Hobbs*, 374 N.C. 345 (2020).[1]

## I.  The *Batson* Framework Properly Understood

In *Batson*, 476 U.S. 79, the Supreme Court created a three-step framework for evaluating claims of racial discrimination in jury selection. At step one, the defendant must make a prima facie showing that the prosecution struck a juror based on race. *State v. Clegg*, 380 N.C. 127, 130 (2022). To do this, the defendant may offer a range of evidence that might support an inference for discrimination. This can include showing patterns in the prosecution's strikes, comparisons between how Black and white jurors were treated, or statements by the prosecutor. *Hobbs*, 374 N.C. at 350.

---

[1] The majority accuses us of imposing a "race-infused world view" and engaging in "racial determinism" for insisting that trial courts meaningfully evaluate evidence of discrimination. But as Bryan Stevenson has observed, "[i]f you don't know your history, you can't really begin to understand what your obligations are, what your responsibilities are, what you should fear, what you should celebrate, what's honorable and what's not honorable." *See* Ezra Klein, *Bryan Stevenson on How America Can Heal*, Vox (July 20, 2020, at 9:20 ET), https://www.vox.com/21327742/bryan-stevenson-the-ezra-klein-show-america-slavery-healing-racism-george-floyd-protests. We cannot "jump to reconciliation" without first telling the truth about discrimination in jury selection, and truth-telling requires comparative analysis: "[Y]ou have to commit to truth-telling first. You can't jump to reconciliation." *Id.* Requiring trial courts to conduct the comparative juror analysis that *Hobbs* and *Flowers* demand–rather than accepting facially race-neutral explanations without scrutiny–is not "racial determinism"; it is fidelity to *Batson*'s constitutional command that strikes not be "motivated in substantial part by discriminatory intent." *Flowers*, 588 U.S. at 303.

This inferential showing is not a "high hurdle." *Id.* (quoting *State v. Waring*, 364 N.C. 443, 478 (2010)). Moreover, the defendant's burden "is one of production, not of persuasion." *Id.* at 351. This means that the defendant does not have to prove discrimination at this stage. Rather, the defendant must offer "evidence [supporting] . . . an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005).

If the defendant clears that low bar, then he "transfer[s] the burden of production to the State." *Hobbs*, 374 N.C. at 350. This is step two. At this stage, the prosecution must explain its peremptory challenges in race-neutral terms. *Clegg*, 380 N.C. at 130. At step three, the trial court must determine whether the defendant has carried his "burden of showing purposeful discrimination." *Hobbs*, 374 N.C. at 353. Then, the judge considers the "prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances," including "the arguments of the parties." *Id.* (quoting *Flowers*, 588 U.S. at 302). The trial court's role at this stage is critical—it must weigh all the evidence and decide whether the challenged strike was "motivated in substantial part by discriminatory intent." *Id.* (quoting *Flowers*, 588 U.S. at 303).

At its core, *Batson*'s "burden-shifting framework" is an information-gathering tool. *See id.* at 351 (quoting *Johnson*, 545 U.S. at 169–70). Steps one and two exist to elicit all relevant evidence bearing on racial discrimination. *See id.* at 352 (explaining that the first two steps "govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim" (quoting

*Johnson*, 545 U.S. at 171)). It is only at step three that the persuasiveness of the evidence matters. As this Court noted in *Clegg*, the process is like a scale:

> [I]n step one (and in subsequent rebuttal), the defendant places his reasoning on the scale; in step two (and in subsequent rebuttal), the State places its counter-reasoning on the scale; in step three, the court carefully weighs all of the reasoning from both sides to ultimately decide whether it was more likely than not that the challenge was improperly motivated.

380 N.C. at 149–50 (cleaned up).

## II.    When Step One of *Batson* Becomes Moot

Under federal and North Carolina precedent, the primary focus for mootness is whether the court engaged with pretext, not formal labels. Courts have sensibly recognized that step one of *Batson* serves a purpose but is not an end in and of itself. Its function is to coax the objector to offer enough evidence of discrimination "to shift the burden of going forward to the State." *State v. Robinson*, 330 N.C. 1, 17 (1991). However, if the State has already come forward with justifications—whether voluntarily or at the trial court's urging—then step one has done its job and there is no need to go back and ask whether the defendant met the initial burden. *Id.* Since the trial court has the information steps one and two are meant to produce, it can move directly to the real issue: whether there was discrimination at play. In such cases, step one is moot.

Federal precedent also confirms this approach. In *Hernandez v. New York*, 500 U.S. 352, 359 (1991), the United States Supreme Court held that when the prosecutor

gives race-neutral reasons and the trial court rules on the ultimate question of discrimination, there is no need to revert to any consideration of whether a prima facie showing of discrimination was established.

North Carolina courts have followed this rule. In *State v. Williams*, 343 N.C. 345, 359 (1996), for instance, this Court held that when a trial court moves past step one and considers the State's reasons for a strike, the first stage becomes irrelevant. The same principle appears in *Bell*, *Thomas*, and *Hoffman*. *See State v. Bell*, 359 N.C. 1, 11–12 (2004); *State v. Thomas*, 329 N.C. 423, 430–31 (1991); *State v. Hoffman*, 348 N.C. 548, 551 (1998). In *Hobbs*, this Court reaffirmed that once the prosecution provides justifications and the trial court considers them, there is no reason to revisit step one. 374 N.C. at 354. *Clegg* said the same: if the State moves to step two, then the preliminary question of whether the defendant made a prima facie case no longer matters. 380 N.C. at 157. For once "the defendant and the State have offered their reasoning," the only task left is for the trial court to "determine, in light of these submissions, whether it was more likely than not that the peremptory challenge was improperly motivated." *Id.* (cleaned up).

Past cases offer two circumstances in which step one becomes moot and the trial court must move to step three. The first is when the prosecutor "volunteers his reasons for the peremptory challenges in question before the trial court rules whether the defendant has made a *prima facie* showing." *Hoffman*, 348 N.C. at 551 (quoting *Williams*, 343 N.C. at 359). The second is when "the trial court requires the prosecutor

to give his reasons without ruling on the question of a *prima facie* showing," and then considers those justifications. *Id.* (quoting *Williams*, 343 N.C. at 359). In either case, the function of step one—to shift the burden onto the State to explain its actions—becomes unnecessary.

### III.    *Hobbs*'s Mootness Standard

The majority misreads *Hobbs* and imposes requirements that are absent in that decision and our prior precedent. In *Hobbs*, this Court stated that step one becomes moot "[w]here the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, and the trial court has ruled on them, completing *Batson*'s third step." 374 N.C. at 354. Critically, *Hobbs* also stated that the question of whether a prima facie case was established becomes moot "after the State has provided purportedly race-neutral reasons for its peremptory challenges and those reasons are considered by the trial court." *Id.* at 355.

The majority seizes on the phrase "ruled on them" and constructs an artificial requirement that the trial court must explicitly rule on "the ultimate question of intentional discrimination" before step one can be deemed moot. This reading ignores that *Hobbs* used "considered" and "ruled on" interchangeably to describe the same concept: whether the trial court engaged with the pretext issue. The focus is on substance—whether the court evaluated whether the State's reasons were pretextual—not on whether the court used magic words or formal labels.

Our prior cases confirm this functional approach. In *Robinson*, we held that

step one was moot when the State offered race-neutral explanations and the trial court evaluated them, without requiring any explicit ruling on the ultimate question of intentional discrimination. 330 N.C. at 17. Similarly, in *Thomas*, the trial court credited the prosecutor's explanations as genuine without making a formal step-three ruling, yet we treated step one as moot. 329 N.C. at 430–31. In *Williams*, we held that step one became irrelevant when the trial court moved past it and considered the State's justifications. 343 N.C. at 359. None of these cases required the formalistic showing the majority now demands.

## IV. Step One Was Mooted in This Case

What occurred in this case fits squarely within *Hobbs*'s mootness standard. After Mr. Wilson raised his *Batson* objection, the trial court asked an open-ended question: "Does the State want to be heard?" This was an invitation, not an order. In response, the State voluntarily gave detailed race-neutral justifications for striking both Juror No. 9 and Juror No. 10. Mr. Wilson then rebutted these justifications by presenting comparative juror evidence, arguing that white jurors with similar or stronger connections to the case were not struck. Only after this complete adversarial exchange did the trial court rule.

Critically, the trial court did not merely hear the State's reasons—it evaluated and credited them. The court made findings that directly addressed the discrimination issue: "Juror No. 6 was left on the jury and he is a[n] . . . African-American male. The State has not targeted race as a component of its questioning.

The Court did note the demeanor of Juror No. 10 during questioning and certainly was concerned about her." These findings resolve the pretext question. The court concluded that the State had not engaged in racial discrimination and specifically endorsed the State's explanation that Juror No. 10's inattentiveness justified her removal.

This is precisely what *Hobbs* describes as mootness: the State provided reasons, the trial court considered them, and the court made findings accepting those reasons as genuine rather than pretextual. The only difference between the present case and *Hobbs* is the label the trial court attached to its ruling. In *Hobbs*, the trial court called it a "full hearing." *See Hobbs*, 374 N.C. at 348. Here, the trial court said it was ruling on the "prima facie case." But the substance was identical in both cases: a complete adversarial presentation on pretext, followed by the trial court's evaluation and acceptance of the State's justifications.

The majority's attempt to distinguish this case rests on the claim that the trial court's comment about Juror No. 10's demeanor was an independent observation rather than an adoption of the State's justification. This claim fails for a simple reason: temporal sequence. If the trial court had independently observed and been concerned about Juror No. 10's demeanor, why not mention this concern before the State explained its strike? Why did the court's comment come only after the State detailed its inattentiveness rationale? And why did the court's language—noting it was "concerned about her"—directly mirror the State's explanation that it had "real

concerns about her commitment to paying attention"?

The obvious answer is that the trial court was adopting and endorsing the State's explanation, not making an independent finding. The majority's presumption that the trial court arrived at this conclusion separately renders trial court's findings essentially unreviewable—any time a judge mentions something the State also mentioned, appellate courts must assume the judge got there independently. This flies in the face of our requirement that trial courts explain their reasoning and defeats meaningful appellate review.

## V.    *Tucker* Does Not Support the Majority's View

The majority relies heavily on *State v. Tucker*, 385 N.C. 471 (2023), but that case does not support its position. *Tucker* presented a narrow issue: whether step one remained moot when a trial court ruled that the defendant failed to make a prima facie showing and then erroneously ordered the State to provide race-neutral reasons "to bolster the appellate record." *Id.* at 490. The majority held that it was error for the trial court to compel a step-two response after determining there was no prima facie case and that under those circumstances, step one was not mooted. *Id.* at 488.

*Tucker*'s holding protected prosecutors from improper compulsion—from being forced to give reasons when not required to do so. But *Tucker* expressly acknowledged that "step one . . . may be mooted when . . . the State *voluntarily* proceeds to the second prong of *Batson* by articulating its explanation for the challenge." *Id.* (cleaned up) (emphasis added). The critical distinction in *Tucker* was that the trial court

ordered the State to give reasons after already ruling at step one. Here, the opposite occurred: the State voluntarily gave reasons before any ruling was made.

The procedural differences are stark:

| *Tucker* | *Wilson* |
|---|---|
| Trial court ruled at step one *first* | Trial court ruled *after* hearing reasons |
| Court *ordered* State to give reasons | State *voluntarily* gave reasons |
| State objected to providing reasons | State willingly moved to step two |
| No adversarial exchange on pretext | Full hearing with rebuttal on pretext |
| Court never credited State's reasons | Court made findings endorsing reasons |

The majority misuses *Tucker*'s protective holding—designed to shield prosecutors from improper orders—to prevent meaningful review of discrimination. This perverts *Tucker*'s narrow holding into a broad anti-mootness rule that contradicts *Hobbs*, *Robinson*, *Williams*, and *Thomas*.

## VI. The Majority's Formalism Defeats *Batson*'s Purpose

The majority's approach prioritizes form over constitutional substance. The majority requires a formal step-three ruling, a "full hearing" label, and precise timing before step one can be deemed moot. None of these requirements appear in *Hobbs*, *Robinson*, *Williams*, or *Thomas*. The majority creates arbitrary line-drawing without providing guidance: How explicit must a step-three ruling be? What specific words must the court say? When is a hearing "full" enough?

What should matter is substance: whether the discrimination issue was evaluated and decided. Here, for Mr. Wilson, a full pretext hearing occurred. The parties presented step-three evidence—statistical patterns, comparative juror analysis, and disparate treatment arguments. The trial court heard both sides and made findings crediting the State's reasons as genuine. The discrimination question was resolved. Yet because the trial court used the phrase "prima facie case" instead of "purposeful discrimination," the majority keeps this case at step one and applies the wrong standard of review.

This formalism has real consequences. In this case, the State struck Juror No. 9 for knowing a Wilson family member from high school thirty years prior. Yet the State kept white jurors who went to high school with the prosecutor herself, cared for the prosecutor's children at daycare, and were close friends with testifying police officers. The State struck Juror No. 10 for childcare concerns. Yet the State kept white Juror No. 1, who stated, "I do not have childcare on Friday" due to a "family vacation [that was] planned," and white Juror No. 11, who said, "I have my great-granddaughter Wednesday through Sunday, every week."

This disparate treatment is the hallmark of discrimination. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (noting that comparative juror analysis reveals pretext); *Flowers*, 588 U.S. at 301 (explaining that disparate questioning and treatment evidences discrimination). Under *Hobbs* and *Clegg*, the trial court was required to conduct a side-by-side comparison of the struck Black jurors and the

accepted white jurors. *See Hobbs*, 374 N.C. at 356, 358. The trial court made no such comparison. It did not address Mr. Wilson's comparative juror arguments. It provided no explanation of how it weighed the evidence. This inadequate analysis is precisely what *Hobbs* condemned and precisely what requires remand. But the majority's rule prevents this comparative analysis from ever occurring. By insisting that step one was not mooted, the majority subjects the trial court's ruling to clearly erroneous review of the prima facie determination rather than requiring the proper step-three analysis *Hobbs* demands. The discrimination that *Batson* prohibits thus escapes meaningful scrutiny, hidden behind the majority's formalistic requirements.

## VII. Conclusion

Step one was mooted under *Hobbs*'s actual standard—that the State provided reasons and the trial court "considered" them. The State voluntarily moved to step two before any ruling. The trial court held a complete adversarial hearing on pretext. The court made findings crediting the State's reasons as nondiscriminatory. This is mootness under any functional reading of our precedent.

The majority departs from that precedent by adding formalistic requirements—explicit rulings on "the ultimate question," "full hearing" labels, and specific timing—that appear nowhere in *Hobbs*, *Robinson*, *Williams*, or *Thomas*. It misreads *Tucker*, extending that case's narrow protective holding far beyond its purpose. And it elevates form over substance, allowing obvious racial discrimination to escape the comparative juror analysis Mr. Wilson's case requires.

I would hold that step one was mooted and affirm the Court of Appeals' judgment remanding for a proper *Batson* hearing. Because the majority refuses to do so, I respectfully dissent.

Justice RIGGS joins in this dissenting opinion.